Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EUGENIO SASTRE FERNÁNDEZ<br><br>Parte Apelada<br><br>v.<br><br>DOCTOR'S CENTER HOSPITAL, Et al.<br><br>Parte Apelante | KLAN202500370 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Civil núm.: SJ2021CV00015<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidenta, la Jueza Rivera Marchand, la Jueza Martínez Cordero y la Jueza Trigo Ferraiuoli.[1]

Trigo Ferraiuoli, jueza ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 18 de mayo de 2026.

Comparece ante nos la parte apelante, Doctor's Center Hospital San Juan, Inc. (Doctor's o parte apelante), mediante recurso de apelación y solicita que revoquemos la *Sentencia* emitida el 28 de marzo de 2025, notificada el 31 de marzo de 2025, por el Tribunal de Primera Instancia, Sala de San Juan (TPI). Mediante el referido dictamen, el TPI declaró Ha Lugar la demanda instada por la parte apelada, Eugenio Sastre Fernández (Sastre Fernández o apelado) y condenó a Doctor's al pago de $25,000.00 en concepto de daños y perjuicios, y concedió el interdicto solicitado por este.

El 11 de agosto de 2025, Sastre Fernández presentó *Alegato de la Parte Apelada.*

Evaluada la solicitud del apelante, la oposición de la parte apelada, el alegato suplementario, así como la transcripción de la prueba oral y los documentos que obran en autos, y por los fundamentos que se exponen a continuación, confirmamos el dictamen apelado.

---

[1] OATA-2025-170.

## I.    Trasfondo fáctico y procesal

El 4 de enero de 2021, Sastre Fernández presentó una demanda[2] sobre daños y petición de orden en contra de Doctor's Center Hospital-San Juan, Inc. e Inmobiliaria San Pedro, Inc. En esta expresó que padece de sordera profunda y que utiliza lenguaje de señas (American Sign Language o ASL[3]) para comunicarse y que pertenece a la comunidad sorda de Puerto Rico. En esencia, el apelado instó dos (2) causas de acción: una, al amparo de la *American with Disabilities Act*[4] (en adelante Ley ADA); y la segunda, de conformidad con la sección 504 del *Rehabilitation Act* de 1973[5], (en adelante *Rehabilitation Act).* De conformidad con los citados estatutos federales, el apelado solicitó un interdicto permanente, con el fin de que se le ordenara a Doctor's a tomar todos los pasos necesarios y apropiados para proteger los derechos estatutarios de Sastre Fernández y la comunidad sorda, tales como una orden que requiera que el hospital proporcione intérpretes de lenguaje de señas calificados y ayudas auxiliares, que establezca políticas, prácticas y procedimientos para salvaguardar los derechos de la comunidad sorda y el nombramiento y designación de un monitor de cumplimiento ante la magnitud de las violaciones e incumplimiento de Doctor's.

En específico, Sastre Fernández alegó que el 22 de julio de 2020 acudió a Doctor's y que estuvo hospitalizado hasta el 6 de agosto de 2020. El apelado expresó que, durante su estadía y tratamiento en la institución hospitalaria, enfrentó barreras de comunicación que interfirieron con su capacidad de poder usar y disfrutar los bienes, servicios, privilegios y acomodos del hospital. Añadió que en ningún momento se le proveyó servicio de intérprete,

---

[2] Véase, Apéndice 1 del recurso, págs. 1-17. (Entrada Núm. 1 SUMAC TPI)
[3] En adelante, ASL.
[4] 42 U.S.C. § 12188.
[5] 29 U.S.C. § 701 et seq.

a pesar de haberlo solicitado en varias ocasiones y que Doctor's sabía que se requerían servicios auxiliares para poder comunicarse. En ese sentido, Sastre Fernández arguyó que, ante la falta de un intérprete, se sintió solo, perdido y desorientado, por lo que no entendió la naturaleza de los procedimientos a los que fue sometido. Añadió que sintió miedo, frustración y humillación, y que sus señas eran ignoradas y que incluso el personal de Doctor's ni siquiera le dio respuesta a sus preguntas cuando le administraban medicamentos, por lo que no se sintió tratado como un ser humano. Como consecuencia de lo anterior, Sastre Fernández argumentó que el incumplimiento de Doctor's con las leyes aplicables estaba motivado por el menosprecio y deshumanización hacia la comunidad sorda y que dicha conducta intencional estaba motivada por un ánimo discriminatorio que ha causado graves daños a la comunidad sorda.

Como resultado de ello, el apelado planteó que sufrió daño emocional y económico, ya que adujo que su estadía se prolongó innecesariamente debido a la falta de comunicación efectiva. Señaló que Doctor's sabía que había solicitado servicios auxiliares para una comunicación efectiva y que esta descartó y rechazó sus solicitudes. Al respecto, alegó que como resultado de las acciones y omisiones de Doctor's, sufrió y continúa sufriendo humillación, angustia y menoscabo a su dignidad personal y su derecho a vivir libre de discriminación o interferencia a sus derechos legales. En vista de ello, alegó que tenía derecho a un remedio interdictal, así como a una indemnización en daños y perjuicios en una suma que no excediera $250,000.00. Además, esgrimió que tenía derecho a una orden que prohibiera a Doctor's a seguir discriminando a las personas con discapacidades al negarse a proporcionar intérpretes de ASL adecuados y otras ayudas auxiliares a las personas sordas.

En cuanto a la segunda causa de acción, instada al amparo del *Rehabilitation Act,* reclamó que Doctor's recibió fondos federales como parte de sus programas y actividades y que con su conducta hacia el apelado violó sus derechos bajo el referido estatuto al "excluir a la parte demandante o negarle beneficios solamente por razón de su discapacidad"[6]. A tenor, destacó que la sección 505 del citado estatuto establece que el apelado tenía derecho a una compensación por sus daños, costas, gastos de litigio y honorarios de abogado. En virtud de lo antes expuesto, solicitó al TPI varios remedios legales, en resumen, que el foro *a quo* aceptara jurisdicción y declarara que Doctor's violó la Ley Ada, el *Rehabilitation Act,* que concediera un interdicto permanente que ordenara a Doctor's llevar a cabo todos los pasos necesarios que el TPI considere apropiados para proteger los derechos estatutarios del apelado. También reclamó daños compensatorios económicos y no-económicos, así como honorarios de abogado y las costas y gastos del litigio.

El 26 de marzo de 2021, Doctor's presentó *Contestación a Demanda[7],* en la que negó la mayoría de las alegaciones y presentó varias defensas afirmativas. En específico, Doctor's alegó afirmativamente que Sastre Fernández no solicitó asistencia o servicio de intérprete y que manifestó entender los servicios y tratamientos que le proveyeron mientras convaleció en la institución hospitalaria. En cuanto a las alegaciones bajo el *Rehabilitation Act,* Doctor's arguyó que cumplió con las leyes y reglamentaciones estatales y federales aplicables y que no incurrió en ningún acto u omisión en menoscabo de los derechos del apelado. Además, planteó que Sastre Fernandez no alegó daños bajo el Código Civil en su demanda, por lo que no procedía adjudicación ni otorgación de daños y perjuicios, que este no mitigó los daños y que el tribunal no

---

[6] Apéndice 1 del recurso, pág. 15. (Entrada Núm. 1, SUMAC TPI).
[7] Apéndice 2 del recurso, págs.18-28. (Entrada Núm. 16, SUMAC TPI.)

tenía jurisdicción sobre la materia. También argumentó que no aplicaban los remedios solicitados bajo las leyes federales y que su causa de acción no cumplía con los requisitos para la concesión de una orden de interdicto.

Luego de varios trámites procesales, el 21 de abril de 2022, las partes presentaron de forma conjunta el *Informe de Conferencia con Antelación a Juicio[8],* y el 22 de abril de 2022 se celebró la conferencia con antelación a juicio[9]. En esta, las partes presentaron sus teorías y controversias en torno a la prueba testifical, entre otros asuntos[10]. Conforme surge de la minuta, el juicio quedó señalado para los días 22, 23 y 24 de febrero de 2023, de manera presencial y comparecería un intérprete para asistir a Sastre Fernández. Así las cosas, el 17 de febrero de 2023, Doctor's presentó tres mociones informativas anejando su prueba documental[11].

Llegada la fecha de celebración del juicio, el primer día inició con el testimonio del apelado, Eugenio Sastre Fernández quien estuvo asistido por los intérpretes, Sr. José Pereira Luna y Sr. Melvin Santos Román. El apelado fue contrainterrogado por la licenciada Miranda de León. Luego se procedió con el testimonio de la enfermera, Sra. Betzaida Rodríguez Rivera y de la Sra. Loyda Peroza

---

[8] Entrada Núm. 47 SUMAC TPI.

[9] Véase, *Minuta,* Entrada Núm. 49 SUMAC TPI.

[10] A modo de resumen, durante la vista, Doctor's esgrimió que las alegaciones de Sastre Fernández se hicieron solamente bajo la Ley ADA. Sin embargo, en la parte IV del *Informe de Conferencia con Antelación al Juicio*, Doctor's expuso planteamientos específicos en cuanto a la controversia de la acción de daños y perjuicios sufridos. También objetó que Sastre Fernández anunciara los mismos testigos que anunció Doctor's. El TPI permitió los testigos anunciados por entender que no causaría perjuicio. Por último, Sastre Fernández renunció a cualquier causa de acción de lucro cesante o pérdida de ingreso por los hechos alegados. Véase, Entrada 47 y 49 de SUMAC TPI.

[11] Véase, Entradas Núm. 54 a la 56 de SUMAC. La prueba de Doctor's consistió en lo siguiente: Exhibit 1-Parte Demandada-Servicios y Ayudas Especiales para personas con discapacidad; Exhibit 2-Parte Demandada-*Policy and Procedure for Providing Auxiliary Aids for Persons with Disabilities*; Exhibit 3-Parte Demandada-Contrato; Exhibit 4-Parte Demandada-Entrevistas Departamento de Programas Institucionales; Exhibit 5-Parte Demandada-Letrero Servicios de Intérprete (Entrada Núm. 54 SUMAC TPI); Exhibit 6A-Parte Demandada-Récord Médico del Demandante; Exhibit 6B-Parte Demandada-Récord Médico del Demandante (Entrada Núm. 55 SUMAC-TPI); Exhibit 6C-Parte Demandada-Récord Médico del Demandante; Exhibit 6D-Récord Médico del Demandante; Exhibit 6E-Parte Demandada-Récord Médico del Demandante; Exhibit 6F-Parte Demandada-Récord Médico Parte Demandante (Entrada Núm. 56 SUMAC TPI).

Espinosa, terapista respiratorio. Por último, se desfiló el testimonio vía video conferencia a través de la plataforma *Zoom* del Dr. Ubaldo Santiago Buono. Estos fueron contrainterrogados por la licenciada Miranda de León. También se desfiló prueba documental[12], la cual fue admitida por el TPI y marcada.[13] El día siguiente continuó con el testimonio de la Dra. Lilia Sánchez Pérez y la Sra. Betzaida Rodríguez Rivera[14]. Además, la parte demandante desistió en cuanto a Inmobiliaria San Pedro, Inc. El último día del juicio, testificó la Sra. Marielis Ramos Vázquez, terapista respiratorio y el caso quedó sometido.

El 28 de marzo de 2025, notificada el 31 de marzo de 2025, el TPI emitió la *Sentencia[15]* apelada. En esta, a la luz de la prueba documental y adjudicada la credibilidad de los testigos, el TPI hizo las siguientes determinaciones de hechos:

1. El Sr. Eugenio Sastre Fernández[16], es maestro e intérprete de lenguaje de señas.
2. Durante toda su vida ha padecido de sordera profunda por lo que no escucha ni entiende las palabras auditivamente. Por ello, necesita utilizar audífonos para amplificar los sonidos a su alrededor[.]
3. Sin embargo, depende de que se comuniquen con él en lenguaje de señas y de realizar labio lectura[17]. El uso de audífonos no es suficiente para entender el significado de las palabras. El Sr. Sastre sí puede expresarse utilizando su voz, pero so tono está evidentemente afectado como consecuencia de la condición auditiva.
4. Como parte de su trabajo de intérprete en las agencias gubernamentales, presta servicios a la comunidad sorda

---

[12] Parte Demandada Exhibit 1 (entrada en sumac 54 -1) Servicio y Ayudas Especiales para Personas con Discapacidad. Exhibit 2 (entrada en sumac 54 – 2) Policy and Procedure for Providing Auxiliary Aids for Persons with Disabilities. Exhibit 3 (entrada en sumac 54 – 3) Contrato con American Sign Language Services Latino PR, Inc. Exhibit 4 (entrada en sumac 54 – 4) Entrevistas Departamento de Programas Institucionales. Exhibit 5 (entrada en sumac 54 – 5) Foto de Letreros de Servicios de Intérpretes de Lenguajes de Señas. Exhibit 6a y 6b (entrada en sumac 55 - 1 y 55 - 2) Récord Médico del demandante Eugenio Sastre Fernández en el Doctor´s Center Hospital San Juan con fecha del 20 al 28 de marzo de 2020. Exhibit 6C al 6F (entrada en sumac 56 – 1 al 56 – 4) Récord Médico del demandante Eugenio Sastre Fernández en el Doctor´s Center Hospital San Juan con fecha del 20 al 28 de marzo de 2020.
[13] Véase, *Minuta* del 22 de febrero de 2023, Entrada Núm. 64 de SUMAC-TPI.
[14] Véase, *Minuta* del 23 de febrero de 2023, Entrada Núm. 70 de SUMAC-TPI.
[15] Entrada Núm. 107 SUMAC-TPI.
[16] La nota al calce número 1 de la sentencia apelada: "Durante su testimonio y juicio estuvo asistido por in intérprete de señas".
[17] La nota al calce número 2 de la sentencia apelada: "De hecho, nos mereció credibilidad que no podía escuchar las preguntas y expresiones de los abogados o juez que se hicieron en sala; dependiendo del servicio de intérprete para entender y expresarse."

durante época de huracanes, manejo de emergencias, etc. Para ello, utiliza otro intérprete que le provee la información y él la aplica a las realidades culturales y regionalismos del lenguaje local.

5. El 22 de julio de 2020, el Sr. Sastre se encontraba seriamente afectado de salud. Entre otros síntomas, tenía tos incontrolable, dificultad respiratoria y visión borrosa. Por tal razón, visitó la sala de emergencias del Doctor's Hospital en Santurce.

6. Al llegar, trató de entrar a las facilidades por el área de sala de emergencias, pero el guardia de seguridad que se encontraba allí no se lo permitió.

7. Ante su sorpresa, trato de entablar alguna comunicación con el funcionario para explicarle la situación, pero no se entendían. La situación se agravaba pues el guardia utilizaba una mascarilla en el rostro que impedía que pudiera leerle los labios o ver su expresión facial.

8. Nos mereció credibilidad el testimonio del demandante cuando declaró que, ante esta situación, se sintió frustrado, preocupado y humillado pues no entendía por qué estaban negando la entrada.

9. Luego de que no le permitieron entrar al área de emergencias, lo llevaron hasta una carpa en otro lugar sin explicarle qué estaba pasando.

10. Todo esto le causó que tuviera ganas de gritar por la frustración, incertidumbre y desconocimiento del protocolo para atenderle.

11. En ese lugar otro lugar (sic), un guardia de seguridad no dejaba que se le acercara y le indicaba con sus manos que se estuviera quieto. Dado que la mascarilla que utilizaba no era transparente, solo podía verle los ojos y no podía entender qué estaba pasando.

12. El Sr. Sastre declaró que mientras esto sucedía, también sentía miedo pues su afección de salud era seria y no lo habían dejado entrar a sala de emergencias.

13. Ante lo que le estaba pasando, nos merece credibilidad que el demandante solicitó que se le proveyera algún servicio de intérprete.

14. Fue creído que el personal de la parte demandada no pudo explicarle adecuadamente qué estaba pasando. Solo le dieron un pedazo de papel, pero con la desesperación, nerviosismo y la visión borrosa tampoco podía verlo bien.

15. A pesar de que en ocasiones trató de comunicarse con su celular para que leyeran lo que escribía y le entregaran otro aparato con las respuestas, también se negaron a coger el teléfono o darle el de ellos.

16. En esas circunstancias esperó aproximadamente por 30 minutos hasta que finalmente fue atendido por unas enfermeras.

17. A pesar del pedido del demandante, no le proveyeron el servicio de intérpretes en persona o por medio remoto. Por el contrario, comenzaron a brindarle atenciones médicas y ponerle un suero.

18. Mientras esto estaba pasando, el demandante sentía que le estaban hablando, pero no podía entenderles. Por eso, les pedía y hacía gestos para que se bajaran la mascarilla, pero no lo hicieron.

19. Posteriormente, fue llevado a una habitación de aislamiento por un diagnóstico de pulmonía y COVID 19, donde permaneció hospitalizado hasta el 5 de agosto de 2020.

20. Durante todo el tiempo que estuvo hospitalizado el personal que lo atendió se mantuvo utilizando una mascarilla N95 que les cubría la boca y nariz. Además, tenían protección en el rostro (mask shield), entre otro equipo de seguridad.

21. Nos merece completa credibilidad el testimonio del demandante, luego de ver su forma de expresión, cuando declaró que se sintió desesperado por no entender lo que ocurría. En sus propias palabras, se sentía como una "rata de laboratorio", con miedo por su situación de salud y falta de información completa de su diagnóstico, tratamiento y prognosis.

22. También nos mereció absoluta credibilidad cuando declaró, que su problema de sordera profunda era evidente para la parte demandada desde el primer momento que llegó al hospital. Esto, pues se puede deducir de su tono de voz, expresiones directas al mostrarles el audífono y gestos que realizó para tratar de explicar su situación.

23. Aun así, no se tomaron medidas iniciales adecuadas para explicarle los protocolos de seguridad COVID 19, las razones de aislarlo y la disponibilidad de recursos para atender sus necesidades especiales.

24. La parte demandada tampoco brindó alternativas para que comunicaran con él de formal alterna, mediante el uso de pizarras, computadora, celular, etc.

25. No nos mereció credibilidad ninguno de los testimonios de los testigos de la parte demandada, cuando declararon que en sus intervenciones con el paciente no pudieron identificar ninguna información que les permitiera saber que el Sr. Sastre, tenía problemas de audición.

26. Tampoco nos mereció ninguna credibilidad los testimonios de la enfermera y terapista respiratoria que lo atendieron, cuando declararon que durante la hospitalización hablaba con normalidad y no se percibía nada que indicara que tenía problemas de audición.

27. Por el contrario, la prueba demostró que estas entendieron que era suficiente que el demandante pudiera verbalizar. Esto, aun cuando les pidió algún acomodo para su problema de audición, no entendiera realmente lo que estaba pasando ni existiera una comunicación efectiva.

28. Si bien la prueba demostró que el Sr. Sastre sí explicó su situación de salud, también es cierto que no escuchaba las respuestas o información que se le brindaba.

29. A los tres o cuatro días de estar en esa incertidumbre, la frustración fue tan fuerte que tuvo que incluso gritar en su habitación y "hablar un poco malo". En respuesta, el médico que lo atendió trató de dirigirse a él subiéndole el tono de voz mucho más, pero esto lo hacía sentir humillado y desesperado pues aun así no lo entendía.

30. Fue creído el testimonio del demandante, cuando declaró que la comunicación durante su hospitalización se le hizo sumamente complicada, frustrante e incompleta a pesar

de sus solicitudes para que se le brindaran alternativas de acomodo tales como un intérprete, poder leer los labios al personal, interpretación remota o por celular[18].

31. Toda esta situación resultó en una experiencia traumática para el demandante.

32. Durante la hospitalización el demandado recibió el tratamiento médico que su condición requería y fue dado de alta sin mayores complicaciones físicas.

33. También fue prueba creída que para la fecha de los hechos la parte demandada sí contaba con un protocolo escrito para la atención de pacientes con discapacidades.

34. El hospital, además, tenía contratada una compañía de servicios de intérpretes para que comparecieran a las facilidades personalmente o a través de videollamadas de requerírseles.

35. Dicho protocolo existía para garantizar que personas con discapacidades recibieran servicios en igualdad de condiciones y fue aprobado en octubre de 2015.

36. No obstante, para marzo de 2020, se declaró la existencia de un estado de emergencias ante el impacto del Covid 19.

37. [....]

**38. Fue prueba creída por el tribunal, que la parte demandada no activó el protocolo cuando el Sr. Sastre se presentó a recibir sus servicios a sala de emergencias, ni durante la hospitalización.**

39. **De hecho, el protocolo aprobado en octubre de 2015 y revisado en abril de 2020 (luego de la declaración de emergencia), no incluía medidas para atender a la población sorda que requiriera aislamientos inmediatos al recibir servicios en sus facilidades**.[19]

40. De los récords médicos sometidos en evidencia tampoco surge evidencia o acuse de recibo de que se entregara algún tipo de instrucciones escritas o explicaciones al llegar el paciente.

**41. De la prueba presentada se concluye que los guardias de seguridad y enfermeras que recibieron al demandante y/o lo mantuvieron en el área de aislamiento inicial, no aplicaron el protocolo a pesar de tener conocimiento de su problema de audición.**

42. El Sr. Sastre estaba consciente, cuando fue al hospital, que existía una pandemia en proceso como consecuencia del COVID 19 y que existía la necesidad de medidas de seguridad. **Sin embargo, la parte demandada falló en tomar medidas para prestarle servicios en igualdad de condiciones que al resto de la población.**

43. Dada la situación de salud por la pandemia de COVID 19, la solicitud del demandante de quitarse la mascarilla para que pudiera ver los labios de la persona no era una opción

---

[18] La nota al calce número 3 de la sentencia apelada: "Resulta ilustrativo el testimonio de la Sra. Betzaida Rodríguez, cuando declaró que durante sus intervenciones procedió como si él escuchara. De hecho, en su contrainterrogatorio llegó a declarar que en su opinión es porque puede escuchar."

[19] La nota al calce número 4 de la sentencia apelada: "Máxime, cuando ya se sabía que como parte del manejo de casos de posibles diagnósticos de COVID 19, se requería el uso de mascarillas N95 y medidas de protección personal lo que obviamente impedía ver los movimientos faciales que forman parte importante de la comunicación con la comunidad sorda.

viable. Sin embargo, existían otras alternativas que hubieran evitado que el demandante sufriera daños por el discrimen.

44. Toda esta situación fue traumática y frustrante para el demandante.

45. Se sentía como una "rata de laboratorio", describió la experiencia como "fuerte", "bien difícil", "horrible", con ganas de gritar, humillante, "frustrante".

46. Fue prueba no impugnada por la parte demandada, que como consecuencia de todo lo anterior no podía dormir y se sintió bien triste.

47. Nos mereció completa credibilidad su testimonio cuando declaró, perdiendo en ese instante su sonrisa y con ojos llorosos, que luego de esto incluso en una ocasión se volvió a enfermar y se quedó en su casa a pesar de que entendía que debía ir a un hospital. Esto, pues le daba miedo volver a vivir esa experiencia.

48. El demandante no recibió tratamiento emocional como consecuencia de estos hechos. (Énfasis nuestro)

En virtud de estas, el TPI concluyó que el testimonio de Sastre Fernández le mereció credibilidad, en particular que el apelado sintió frustración, incertidumbre y desconocimiento[20], que solicitó que se le proveyera algún servicio de intérprete[21], que su problema de sordera profunda era evidente para Doctor's desde el primer momento que llegó al hospital[22]. Por otro lado, el TPI expresó que no le mereció credibilidad el testimonio de ninguno de los testigos de Doctor's cuando declararon que, durante sus intervenciones con Sastre Fernández, estos no pudieron identificar información alguna que les permitiera conocer que el apelado tenía problemas de audición[23]. También, le mereció credibilidad lo declarado por el apelado en cuanto a que la comunicación durante su hospitalización fue complicada y frustrante, a pesar de solicitar en múltiples ocasiones los servicios de un intérprete u otros medios auxiliares para facilitar la comunicación efectiva durante su convalecencia[24]. El foro *a quo* concluyó que la situación resultó traumática para Sastre Fernández[25].

---

[20] *Íd.*, página 3, Determinación de hecho número 10.
[21] *Íd.,* página 3, Determinación de hecho número 13.
[22] *Íd.*, página 4, Determinación de hecho número 22.
[23] *Íd.*, página 5, Determinación de hecho número 25 a la 27.
[24] *Íd.*, página 5, Determinación de hecho número 30.
[25] *Íd.*, página 5, Determinación de hecho número 31.

Por otra parte, el foro apelado también determinó que Doctor's contaba con un protocolo escrito para la atención de pacientes con discapacidades y que tenía contratada una compañía de servicios de intérpretes para que presentaran servicios presenciales o por videollamadas[26]. Asimismo, el TPI reconoció que, para marzo de 2020, se había declarado un estado de emergencia a causa del COVID-19. No obstante lo anterior, determinó que el protocolo revisado en abril de 2020, luego de la emergencia por el COVID-19 no incluía medidas para atender a la población sorda que requiriera aislamientos inmediatos al recibir servicios en sus instalaciones[27], y que de los récords médicos no surgía que le hubieran entregado instrucciones escritas o explicaciones al llegar a las instalaciones[28]. En ese sentido, el foro apelado reconoció, que si bien a la fecha de los hechos, por causa de la pandemia del COVID-19 no era viable que el personal de Doctor's se bajara las mascarillas para comunicarse con el apelado, la realidad es que existían métodos tecnológicos alternos para poder atender la necesidad de Sastre Fernández de forma adecuada[29].

A la luz de lo anterior, el TPI concluyó que Sastre Fernández fue víctima de discrimen en la prestación de servicios por parte de Doctor's, y que sufrió daños como consecuencia de las acciones negligentes de los funcionarios del hospital. Señaló que la conducta de la institución hospitalaria fue la causa próxima de que el apelado se sintiera discriminado, humillado y sufriera los daños emocionales alegados. Por ello, y a la luz de lo resuelto por el Tribunal Supremo en *Bonilla v. Chardón*[30], *Santiago Montañez v. Fresenius Medical*[31]

---

[26] *Íd.*, página 5, Determinación de hecho número 33 y 34.
[27] *Íd.*, página 7, Determinación de hecho número 39.
[28] *Íd.*, página 7, Determinación de hecho número 40.
[29] *Íd., página 8,* Determinación de hecho número 43. Véase, además, la página 14.
[30] 118 DPR 599 (1987).
[31] 195 DPR 476 (2016).

Care, y *Suc. Mena Pamias v. Jiménez Meléndez[32]*, el TPI valoró los daños sufridos por Sastre Fernández en $25,000.00.

Por último, el TPI concluyó que Doctor's era un lugar de acomodo público, que Sastre Fernández tenía una discapacidad cualificada para los fines de la Ley ADA y el *Rehabilitation Act,* y que sufrió discrimen al no proveérsele los servicios en igualdad de condiciones y no poder contar con una comunicación adecuada durante su estadía en la institución hospitalaria. Por lo anterior determinó que aunque Doctor's contaba con un protocolo para atender las necesidades del apelado, este no contenía ninguna instrucción sobre cómo atender el problema de continuación inmediata ante una situación de emergencia.

En virtud de ello, concedió el interdicto y ordenó a Doctor's tener disponibles cuando sea necesario tarjetas visuales y pictogramas con instrucciones claras sobre los derechos y servicios disponibles para la comunidad sorda, así como la entrega de un acuse de recibo a cada persona con discapacidades auditivas que contenga información sobre su derecho a recibir ayudas especiales y servicios para una comunicación verbal o escrita efectiva. Por último, el TPI desestimó la causa de acción en cuanto a Inmobiliaria San Pedro, Inc. por falta de prueba, al amparo de la Regla 39.2(c) de Procedimiento Civil.

Insatisfecho con el dictamen, Doctor's acude ante nos mediante recurso de apelación y formuló los siguientes señalamientos de error:

> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR CON LUGAR LA SOLICITUD DE INTERDICTO SEGÚN SOLICITADO BAJO LEY ADA (AMERICANS WITH DISABILITIES ACT), Y EL REHABILITATION ACT (29 U.S.C. § 701 ET SEQ) TODA VEZ QUE EL DEMANDANTE NO ESTABLECIÓ UN CASO PRIMA FACIE BAJO 42 USC § 12181 ET SEQ,. (sic)
>
> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL OTORGAR DAÑOS BAJO EL ARTÍCULO 1802

---

[32] 212 DPR 758 (2023).

DEL CÓDIGO CIVIL, CUANDO LA PETICIÓN DE DAÑOS DEL DEMANDANTE LA REALIZÓ BAJO LAS DISPOSICIONES DEL REHABILITATION ACT Y ADA, EXCLUSIVAMENTE.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, DE FORMA MANIFIESTA EN SU APRECIACIÓN DE LA PRUEBA TESTIFICAL DESFILADA DE LA PARTE DEMANDADA AL NO REALIZAR UN ANÁLISIS JUSTO Y BALANCEADO DE LA MISMA.

El 12 de mayo de 2025, emitimos resolución en la que ordenamos la presentación de la transcripción de la prueba oral, la cual se presentó el 12 de junio de 2025. El 9 de julio de 2025, acogimos la transcripción según fue presentada, luego de haber transcurrido el término concedido para que las partes presentaran objeciones a la misma sin que así lo hicieran.

El 21 de julio de 2025, Doctor's presentó su *Alegato Suplementario*, mientras el 11 de agosto de 2025, Sastre Fernández presentó su *Alegato de la Parte Apelada*.

Con el beneficio de la comparecencia de las partes y la transcripción, estamos en posición de resolver.

## II.     Exposición del Derecho

### A. Apreciación de la prueba

Los tribunales apelativos no intervendrán con las determinaciones de hechos ni las adjudicaciones de credibilidad realizadas por el TPI, al menos que dicho foro haya incurrido en error manifiesto, pasión, prejuicio o parcialidad.[33] Un juzgador incurre en pasión, prejuicio o parcialidad cuando actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que someta prueba alguna".[34] Por otro lado, incurre en error manifiesto cuando la apreciación de la prueba se

---

[33] *Rivera Menéndez v. Action Service*, 185 DPR 431, 444 (2012); *S.L.G. Rivera Carrasquillo v. AAA*, 177 DPR 345, 356 (2009).
[34] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 782 (2013).

aparta de la realidad fáctica o es inherentemente imposible o increíble.[35]

Los tribunales superiores sólo podrán intervenir con las conclusiones cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico sobre la totalidad de la prueba.[36] Lo anterior se debe a que los jueces del foro primario son quienes están en mejor posición de aquilatar la prueba y adjudicar credibilidad incluyendo observar el comportamiento de los testigos mientras ofrecen su testimonio.[37] No obstante, los foros apelativos solo cuentan con *"récords mudos e inexpresivos".*[38] Por lo tanto, son pocos los casos en donde se ha concluido que el foro de instancia incurrió en pasión, prejuicio, parcialidad o error manifiesto.[39]

Conforme a la Regla 42.2 de Procedimiento Civil,[40] "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". La intervención de un foro apelativo con la evaluación de la prueba testifical procede "'en casos en que un análisis integral de dicha prueba cause en nuestro ánimo una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia'".[41] Por ende, la parte apelante que cuestione una determinación de hechos realizada por el foro primario debe fundamentar la existencia de pasión, prejuicio o parcialidad, o error manifiesto.[42]

---

[35] *Pueblo v. Toro Martínez*, 200 DPR 834, 859 (2018).

[36] *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

[37] *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.*, 209 DPR 759, 778-779 (2022); *Santiago Ortiz v. Real Legacy Assurance Company, Inc.*, 206 DPR 194, 219 (2021).

[38] *Rivera Torres v. Díaz López*, 207 DPR 636, 658 (2021) (*citando a S.L.G. Rivera Carrasquillo v. AAA*, supra, pág. 356).

[39] *Dávila Nieves v. Meléndez Marín*, supra, pág. 771.

[40] Regla 42.2 de Procedimiento Civil, supra, R. 42.2.

[41] *S.L.G. Rivera Carrasquillo v. AAA*, supra, pág. 356 (*citando Pueblo v. Cabán Torres*, 117 DPR 645, 648 (1986)).

[42] *S.L.G. Rivera Carrasquillo v. AAA*, supra, pág. 356; *Flores v. Soc. de Gananciales*, 146 DPR 45, 50 (1998).

Ahora bien, a pesar de la deferencia judicial, cuando las conclusiones de hecho del TPI están basadas en prueba pericial o documental, el tribunal revisor se encuentra en la misma posición que el foro recurrido.[43] Ante tales circunstancias, el Tribunal Apelativo tendrá facultad para adoptar su propio criterio con relación a la apreciación y evaluación de la prueba pericial, e incluso para descartarla, aunque resulte técnicamente correcta.[44] De igual modo, podrán sustituir el criterio de los tribunales de primera instancia cuando, a tenor con la prueba admitida, no exista base suficiente que apoye su determinación.[45]

### B. Regla 42.4 de Procedimiento Civil

La Regla 42.4 de Procedimiento Civil[46], dispone lo siguiente:

> Toda sentencia concederá el remedio a que tenga derecho la parte a cuyo favor se dicte, aun cuando ésta no haya solicitado tal remedio en sus alegaciones. Sin embargo, una sentencia en rebeldía no será de naturaleza distinta ni excederá en cuantía a lo que se haya pedido en la solicitud de la sentencia.

### C. *American Disabilities Act* (Ley ADA)

La *Ley para Estadounidenses con Discapacidades*, conocida en inglés como *American Disabilities Act*[47] (Ley ADA), fue promulgada por el Congreso de los Estados Unidos, entre otros fines, para brindar un mandato nacional –claro y completo– para la eliminación de la discriminación contra las personas con diversidad funcional.[48] Asimismo, mediante la citada ley, el Gobierno Federal pretende proporcionar estándares claros, sólidos, consistentes y ejecutables que aborden la discriminación en contra de la referida población.[49]

---

[43] *González Hernández v. González Hernández*, supra, pág. 777.
[44] *Íd.*; *Municipio de Loíza v. Sucns. De Suárez et al.*, 154 DPR 333, 363 (2001).
[45] *Pueblo v. Hernández Doble*, 210 DPR 850, 865 (2022); *Gómez Márquez v. Periódico el Oriental Inc.*, 203 DPR 783, 794 (2020).
[46] 32 LPRA Ap. V R. 42.4.
[47] 42 U.S.C. sec. 12188.
[48] 42 U.S.C. sec. 12101(b)(1). (Traducción nuestra); *Spector v. Norwegian Cruise Line Ltd.*, 545 US 119, 128 (2005).
[49] 42 U.S.C. sec. 12101(b)(2). (Traducción nuestra).

A tenor con la sección 12102(1) de la Ley ADA, el término *discapacidad* o diversidad funcional, con respecto a una persona, se refiere a:

> (a) un impedimento físico o mental que limita sustancialmente una o más **actividades principales** de la vida de tal persona;
>
> (b) un registro de dicho impedimento; o
>
> (c) de quien se considera o percibe que tiene tal impedimento.[50]

El inciso (2) de la citada sección, define actividades principales de la siguiente forma:

> Para propósitos del párrafo (1), actividades principales incluyen, pero no se limitan a, cuidarse por sí mismo, realizar tareas manuales, ver, **oír**, comer, dormir, caminar, pararse, levantarse, doblarse, hablar, respirar, aprender, leer, concentrarse, pensar, comunicarse y trabajar.[51]

Conforme a la finalidad de la Ley ADA, el Título III del mencionado estatuto establece una prohibición general de discrimen en contra de personas con diversidad funcional; ello, en el contexto del disfrute de lugares de acceso público. En particular, la sección 12182 de la Ley ADA dispone que ninguna persona será discriminada por motivos de diversidad funcional en el disfrute pleno e igualitario de los bienes, servicios, instalaciones, privilegios, ventajas o alojamiento de cualquier lugar de acomodo público por parte de alguna persona que posea, arrende u opere dicho lugar.[52] Para propósitos de lo anterior, las prohibiciones generales de prácticas de discrimen, según la referida Ley, incluyen, entre otras, las siguientes:

**(i) Negación de participación**

> Será discriminatorio someter a una persona o clase de personas, basado en la discapacidad o discapacidades de tal persona o clase, directamente, o a través de arreglos contractuales, licencias u otros arreglos, a la negación de la oportunidad del individuo o clase a participar en o beneficio de los bienes, servicios,

---

[50] 42 U.S.C. sec. 12102(1). (Traducción y énfasis nuestros).
[51] 42 U.S.C. sec. 12102(2). (Traducción y énfasis nuestros).
[52] 42 U.S.C. sec. 12182(a). (Traducción nuestra).

> instalaciones, privilegios, ventajas o acomodos de una
> entidad.
>
> **(ii)    Participación en beneficio desigual**
>
> Será discriminatorio proporcionar a una persona o
> clase de personas, basado en un impedimento o
> impedimentos de tal persona o personas,
> directamente o a través de arreglos contractuales,
> licencias u otros arreglos la oportunidad de participar
> en o beneficio de un bien, servicio, instalación,
> privilegio, ventaja o acomodo que no sea igual a aquel
> provisto a otras personas.
>
> **(iii)   Beneficio separado**
>
> Será discriminatorio proveer a una persona o clase de
> personas, basado en un impedimento o impedimentos
> de tal persona o personas, directamente o a través de
> arreglos contractuales, de licencia u otros arreglos, un
> bien, servicio, instalación, privilegio, ventaja o
> acomodo que sea diferente o separado del provisto a
> otras personas, a menos que tal acción sea necesaria
> para proveer a la persona o clase de personas un bien,
> servicio, instalación, privilegio, ventaja o acomodo, u
> otra oportunidad que sea tan efectiva como la provista
> a los demás.[53]

Asimismo, la sección 12182(b)(2)(A) de la referida sección, establece las prohibiciones específicas en cuanto a la discriminación. Esta lee como sigue:

> **(2) Prohibiciones específicas**
>
> **(A) Discriminación**
>
> Para propósitos del sub inciso (a), la discriminación incluye-
>
> (i)      ….
>
> (ii)     La falta en realizar modificaciones razonables en
> políticas, prácticas o procedimientos, cuando dichas
> modificaciones sean necesarias para ofrecer tales
> bienes, servicios, facilidades, privilegios, ventajas o
> acomodos a personas con discapacidades, salvo que
> la entidad pueda demostrar que realizar dichas
> modificaciones alteraría fundamentalmente la
> naturaleza de dichos bienes, servicios, facilidades,
> privilegios, ventajas o acomodos.
>
> (iii)    La falta de tomar las medidas que sean necesarias
> para asegurar que ninguna persona con discapacidad
> sea excluida, se le nieguen servicios, sea segregada o
> tratada de manera diferente debido a la ausencia de
> ayudas y servicios auxiliares, salvo que la entidad
> pueda demostrar que tomar dichas medidas alteraría
> fundamentalmente la naturaleza del bien, servicio,
> facilidad, privilegio, ventaja o acomodo ofrecido, o
> resultaría en una carga indebida.
>
> (iv)     La falta de remover barreras arquitectónicas y de
> comunicación que sean estructurales por naturaleza,

---

[53] 42 U.S.C. sec. 12182 (b)(1)(A)(i) (ii) (iii). (Traducción y subrayado nuestro).

en instalaciones existentes, y barreras de transporte en vehículos existentes..., cuando dicha remoción sea fácilmente ejecutable; y

(v)     Cuando una entidad pueda demostrar que la remoción de una barrera bajo el inciso (iv) no sea fácilmente ejecutable, <u>la falta de hacer tales bienes</u>, servicios, facilidades, privilegios, ventas y acomodos <u>a través de métodos alternos si tales métodos sean fácilmente ejecutables.</u>[54]

En caso de infracciones a la precitada sección 12182 (b)(2)(A)(iv), se podrá solicitar un interdicto preliminar, el cual debe proveer una orden para que se modifiquen las instalaciones en aras de que sean accesibles para personas con diversidad funcional, en la medida requerida por el Título III de la Ley ADA.[55] Cuando corresponda, las medidas cautelares del interdicto deberán contener la exigencia de brindar una ayuda o servicio auxiliar, la modificación de una póliza o la provisión de métodos alternos, según exigido por el citado estatuto.

Ahora bien, para establecer un caso *prima facie* de discrimen al amparo del Título III de la Ley ADA, la parte demandante debe demostrar lo siguiente: (1) que es una persona cualificada con una discapacidad bajo la Ley ADA; (2) que la parte demandada opera un lugar de acomodo público, y (3) que la parte demandante fue discriminada por su discapacidad.[56]

Al determinar si la persona reclamante tiene legitimación activa bajo la Ley ADA, es decir, el derecho a una causa de acción para solicitar un *injunction* de conformidad con lo anterior, un tribunal debe evaluar si dicha parte ha demostrado una amenaza real e inminente de que una barrera particular –ilegal– le puede causar un daño futuro.[57] El daño alegado debe ser real e inmediato,

---

[54] 42 U.S.C. sec. 12182(b)(2)(A). (Traducción y subrayado nuestro).

[55] 42 U.S.C.A. sec. 12188(a)(2). (Traducción nuestra).

[56] *Medina–Rodríguez v. Fernández Bakery, Inc.,* 255 F.Supp. 3d 334, 341 (DPR 2017). (Traducción nuestra).

[57] *Santiago Ortiz v. Caparra Ctr. Assocs., LLC,* 261 F. Supp. 3d 240, 248 (DPR 2016), citando a *Dudley v. Hannaford Bros. Co.,* 333 F.3d 299, 305–06 (1er Cir. 2003). (Traducción nuestra).

no abstracto o hipotético.[58] Por lo tanto, la persona que solicita un interdicto preliminar debe establecer una amenaza real e inmediata de que se producirá una conducta ilegal.[59]

A la luz de la normativa antes expuesta, procedemos a disponer de la controversia ante nuestra consideración.

### III.    Aplicación del Derecho a los Hechos

En síntesis, Doctor's plantea que el foro primario erró al conceder el interdicto al amparo de la Ley ADA y el *Rehabilitation Act* porque sostiene que Sastre Fernández no estableció un caso *prima facie* al amparo de dichos estatutos. Añade que el TPI incidió al otorgarle al apelado una compensación en concepto de daños y perjuicios, pues arguye que Sastre Fernández presentó su demanda exclusivamente bajo la Ley Ada y *Rehabilitation Act* y no bajo el Artículo 1802 del Código Civil[60]. Por último, Doctor's argumenta que el foro de instancia erró en su apreciación de la prueba y que no hizo un análisis justo y balanceado de esta.

Evaluados los argumentos de las partes litigantes y la transcripción de la prueba oral, procedemos a resolver.

### A.

Discutiremos el primer y segundo señalamiento de error de forma conjunta, por estar relacionados a las alegaciones de la demanda presentada por el apelado. En primer lugar, Sastre Ferández presentó varias alegaciones al amparo de la Ley ADA y el *Rehabilitation Act*, a saber, que padece de sordera profunda y que utiliza lenguaje de señas para comunicarse, que el 22 de julio de 2020 acudió a la sala de emergencias del Doctor's Center Hospital-San Juan, Inc., donde enfrentó barreras de comunicación en su

---

[58] *Íd*. (Traducción nuestra).
[59] *Íd*., citando a *O'Shea v. Littleton*, 414 US 488, 494 (1974). (Traducción nuestra).
[60] El Código Civil de Puerto Rico de 1930, vigente al momento en que surgieron los hechos del presente caso, fue derogado y sustituido mediante la Ley Núm. 55-2020, aprobada el 1 de junio de 2020, conocida como *Código Civil de Puerto Rico de 2020*. Éste entró en vigor el 28 de noviembre de 2020.

diagnóstico y tratamiento lo cual le provocó daño emocional, ante la falta de comunicación efectiva y falta de activación de protocolo por parte de Doctor's, ante su discapacidad. Lo anterior, ciertamente nos lleva a coincidir que Sastre Fernández cumplió con los requisitos *prima facie* para establecer su reclamación al amparo de la Ley ADA y el *Rehabilitatoin Act*, pues el apelado en efecto sufre de una discapacidad reconocida por la Ley ADA, Doctor's constituye un lugar de acomodo público conforme definido en dicho estatuto y Sastre Fernández fue discriminado por su discapacidad por la institución hospitalaria al esta no proveerle un servicio de intérprete u otro método auxiliar de comunicación durante su estadía de trece (13) días en la referida institución hospitalaria. Asimismo, el foro primario determinó que Doctor's falló en tomar medidas para prestarle servicios a Sastre Fernández en igualdad de condiciones.

También, al foro de instancia le mereció credibilidad que las actuaciones y omisiones de Doctor's durante el diagnóstico y tratamiento de Sastre Fernández le ocasionaron daños emocionales por el discrimen vivido. A tenor, conforme surge de la demanda presentada, Sastre Fernández planteó que, como resultado de las acciones y omisiones de Doctor's, este sufrió humillación, angustia y menoscabo de su dignidad personal y derecho a vivir libre de discrimen[61], por lo que tenía derecho a una indemnización por daños y perjuicios[62]. De hecho, surge de la propia faz de la demanda[63] que Sastre Fernández reclamó que sufrió un daño emocional como resultado de las experiencias vividas y la indiferencia y negativa de Doctor's en proveerle mecanismos auxiliares para lograr una comunicación efectiva.

---

[61] Véase, alegación núm. 52 de la demanda.
[62] Alegación núm. 53 de la demanda.
[63] Véase, alegaciones número 47, 49 52 y 53 de la demanda. (Entrada Núm. 1 SUMAC TPI).

En ese sentido, salta a la vista que, contrario al planteamiento de Doctor's de que el apelado no presentó alegación o reclamación bajo el Art. 1802 del Código Civil, lo cierto es que, en su contestación a demanda, la parte apelante presentó alegaciones responsivas específicas y dirigidas a rebatir las alegaciones de daños que Sastre Fernández presentó en su demanda, por lo que, desde que se instó la demanda Doctor's tuvo oportunidad de refutar y defenderse de tales alegaciones, y así lo hizo tanto en su alegación responsiva como en su parte del *Informe de Conferencia con Antelación al Juicio*[64]. Además, y tal como expusimos en la segunda parte del presente escrito, el tribunal podrá conceder mediante sentencia el remedio al que tenga derecho la parte a cuyo favor se dicte aun cuando una parte no haya solicitado tal remedio. Este no es el caso, pues Sastre Fernández solicitó tanto el remedio interdictal bajo la Ley ADA y *Rehabilitation Act*, como una indemnización en daños y perjuicios. No se cometieron los errores señalados.

**B.**

Por último, pasamos a discutir el tercer señalamiento de error, que se relaciona con la apreciación de la prueba. En esencia, la parte apelante afirma que el foro primario incurrió en error manifiesto de la apreciación de la prueba testifical desfilada[65] y que no se hizo un análisis justo y balanceado de la misma.

Por su parte, Sastre Fernández sostiene que el foro de instancia le otorgó credibilidad a su testimonio y determinó que este demostró que padece de sordera profunda y depende del lenguaje de señas para comunicarse efectivamente, que, al llegar al hospital, intentó explicar su condición, pero no pudo comunicarse

---

[64] Véase, Entrada Núm. 16 y Entrada Núm. 47 de SUMAC TPI.
[65] Conforme expuesto por la parte apelante en su *Alegato Suplementario*, esta hizo énfasis que el caso de autos tuvo la particularidad de que *ambas* partes anunciaron la misma prueba testifical; a saber, a los funcionarios de Doctor's. Por ello, basa principalmente su argumentación en que la prueba testifical de la parte demandante contradice directamente las determinaciones de hecho del tribunal, en específico las determinaciones número 13, 22 y 25 a la 27.

adecuadamente con el personal y que solicitó expresamente los servicios de intérprete o alternativas de comunicación que le fueron negadas. A la luz de lo anterior, el apelado plantea que, debe prevalecer la norma de deferencia a las determinaciones de hecho del foro de instancia, pues fue quien estuvo en mejor posición de aquilatar la prueba desfilada. Veamos.

Luego de un examen cuidadoso y sereno de los alegatos de las partes, y contando con el beneficio de la transcripción de la prueba oral, concluimos que el TPI no erró en la apreciación de la prueba. Nos explicamos.

Conforme surge de la sentencia apelada y de la transcripción de la prueba oral, Sastre Fernández declaró que es maestro e intérprete de lenguaje de señas, que ha padecido de sordera profunda durante toda su vida y que necesita audífonos para amplificar los sonidos a su alrededor, pero que depende de que se comuniquen con él a través de lenguaje de señas y de realizar labio lectura[66]. El apelado testificó que el 22 de julio de 2020, Sastre Fernández acudió a la sala de emergencias con síntomas de tos profunda, dificultad respiratoria y visión borrosa. Al llegar a la sala de emergencia, el guardia de seguridad le impidió la entrada y aun cuando trató de establecer comunicación con dicho funcionario, estos no se entendían[67]. La falta de comunicación efectiva entre estos se complicó debido que el guardia utilizaba una mascarilla en su rostro, por lo que el apelado no podía ver sus expresiones faciales

---

[66] Determinaciones de hecho 1 a la 3.

[67] Sastre Fernández manifestó lo siguiente a preguntas de su abogado:

> P. ¿Y cuando llega, a dónde específicamente del hospital llegó? ¿Si nos puede describir, por favor, pues qué…. esos detalles?
>
> R Yo traté de entrar a la ventanilla, pero no me permitieron. Había un guardia, un policía al frente, hablándome y yo, pues, no entendía lo que me estaba diciendo. Así que, pues, trataba de hacerle señas. **Le dije que era sordo, que no escuchaba.** Le traté de hacer señas, pero no nos estábamos entendiendo para nada. No nos entendíamos de ninguna manera. (Transcripción de la Prueba Oral, vista del 22 de febrero de 2023, página 44, líneas 2-12.)

o realizar labio lectura para tratar de entender al guardia de seguridad.[68] Asimismo, le mereció credibilidad al foro *a quo* que Sastre Fernández expresamente solicitó intérprete[69] o alternativas de comunicación las cuales le fueron negadas[70]. A ello se le añade que durante su estadía un médico que le atendía le habló en un tono de voz alto lo que ocasionó que el apelado se sintiera humillado y frustrado porque aun así no entendía lo que le decían.[71] Lo anterior se desprende de la transcripción y el tribunal le otorgó credibilidad, por lo que concluimos que las determinaciones de hechos emitidas por el foro primario están sustentadas por la prueba que el tribunal tuvo ante sí. Así, considerando que la prueba desfilada fue corroborada con el testimonio de Sastre Fernández, concluimos que la parte apelante no nos ha puesto en posición de determinar que, ante los hechos particulares del presente caso en la apreciación de

---

[68] Véase, determinaciones de hecho 5 a la 7, y Transcripción de la prueba oral (TPO), vista de 22 de febrero de 2023, página 44, líneas 5-12; página 53, líneas 8-14, página 54, línea 21 y página 57, líneas 2-12.

[69] A preguntas de su abogado, Sastre Fernández declaró lo siguiente:

> P Sí, por favor. Sí, para fines de que el Tribunal entienda lo que las personas escucharon, si pudiese vocalizar, como usted menciona, cómo usted pidió intérprete. Si se siente cómodo con eso, por supuesto.
>
> R Sí, no tengo problema con eso. (Verbalizó el testigo). "Necesito que me ponga intérprete. Necesito que me ponga intérprete". Yo no escucho lo que estoy diciendo. No, no entiendo nada de lo que yo estoy diciendo, pero sí, fue lo que yo dije.
>
> P Bueno, que el récord… Solicitamos que el récord refleje que el, el señor Eugenio Sastre vocalizó con su voz, pues, lo que dijo, ¿no?, que escuchó el Tribunal.
>
> HON. JUEZ ARNALDO CASTRO CALLEJO:
>
> Para los fines del registro, a las 10:37 de la mañana del día de hoy, el testigo vocalizó: "Necesito que me pongan intérprete, necesito que me pongan intérprete. No entiendo nada.["] (Transcripción de la prueba oral, vista del 22 de febrero de 2023, pág. 57, líneas 2-21. Véase también, pág. 58, líneas 1-9).

[70] Sastre Fernández también contestó lo siguiente:

> P Unjú. ¿Qué mecanismo, si alguno, le dieron para que usted se pudiese comunicar de un…. sin intérprete?
>
> R. Nada. No me dieron nada. Cero.
>
> P ¿Por cuánto tiempo se repitió esta situación, si se repitió, a través de su estadía en el hospital?
>
> R Por los trece días. (*Íd.*, pág. 59, línea 18-25).

[71] *Íd.*, pág. 60, líneas 5-16.

la prueba del foro primario hubiese mediado pasión, prejuicio, parcialidad o error manifiesto.

La prueba admitida y creída por el foro primario demostró que Sastre Fernández tenía una discapacidad reconocida por la Ley ADA, que Doctor's era un lugar de acomodo público conforme definido por dicho estatuto, y que el apelado, a pesar de expresar su discapacidad y solicitar se le proveyeran servicios de intérprete o método auxiliares para facilitar la comunicación durante su diagnostico y tratamiento en el hospital, le fue negado el servicio. Además, ante prueba escuchada y creída, el TPI concluyó que la omisión del Hospital en proveerle dichos servicios al apelado le ocasionaron daños emocionales. Lo anterior se encuentra sustentado por la prueba que el foro tuvo frente ante sí. Por ello, procede confirmar el dictamen apelado.

### IV. Parte dispositiva

Por los fundamentos que anteceden, se confirma la sentencia apelada.

Notifíquese.

Lo acuerda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones